UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**AMY MONTGOMERY**,                                 Case No. 4:11 CV 971

        Plaintiff,                             Magistrate Judge James R. Knepp II

    v.                                                MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.

## INTRODUCTION

In this disability benefits case, Plaintiff Amy Montgomery seeks judicial review of the Commissioner's denial of her application for Title II disability insurance benefits (DIB). The parties have consented to the undersigned's jurisdiction. (Doc. 14). Because the administrative law judge (ALJ) permissibly discounted the opinion evidence of Plaintiff's treating physician, as well as properly assessed Plaintiff's credibility, the Commissioner's decision is affirmed.

## BACKGROUND

**Vocational Background**

Plaintiff was 33 years old at the time of the administrative hearing. (Tr. 30). She is a high school graduate who completed one year of college education for a licensed practical nurse degree. (Tr. 30). Plaintiff has past relevant work experience as a licensed practical nurse, nurse's aid, and cashier. (Tr. 31). Plaintiff last worked in August 2007 as a private duty practical nurse. (Tr. 31).

**Treatment History**[1]

Plaintiff's treating physician, Dr. Charles D'Auria, reported that Plaintiff stopped working in August 2007 due to pregnancy complications. (Tr. 215). Plaintiff gave birth in January 2008, and at a follow-up post partum examination, reported pelvic pain and depression. (Tr. 215–16). She was prescribed medication and told to resume normal activities. (Tr. 215).

In April 2008, Plaintiff presented at the emergency room with left shoulder pain. (Tr. 250). She was diagnosed with a shoulder sprain, prescribed Vicodin, and instructed to follow-up with Dr. D'Auria. (Tr. 252–53). MRI scans and x-rays of Plaintiff's shoulder taken in May 2008 showed normal findings. (Tr. 270–71).

In July and August 2008, Plaintiff was referred to Dr. Evelyn Oteng-Bediako at Horizon Pain Management clinic for pain in her neck, left shoulder, and lower back radiating into her legs, as well as numbness and tingling in her arms and legs. (Tr. 261–65). Plaintiff presented with a normal gait, and was able to stand on her heels, toes, and squat, but also had a reduced range of motion of the cervical spine and left shoulder, tenderness in several areas of her body, and a weaker hand grasp on the left side than on the right. (Tr. 262).

Dr. Oteng-Bediako ordered cervical and lumbar MRIs, but both were negative. (Tr. 264). Furthermore, Dr. Oteng-Bediako noted there were no disk bulges, protrusions, or extrusions, no spondylosis, and no foraminal narrowing of spinal canal stenosis. (Tr. 264). Plaintiff was treated with trigger point injections at the trapezius, and the lumbar and cervical spinal muscles. (Tr. 265).

Plaintiff returned to Dr. D'Auria in August 2008, who then diagnosed Plaintiff with

---

[1] Plaintiff's medical history also includes mental evaluations and treatment. However, because Plaintiff only challenges the ALJ's determination with respect to her physical impairments, the Court only reviews Plaintiff's physical treatment history.

fibromyalgia for the first time. (Tr. 313). In May 2009, Dr. Magdy K. Iskander, a rheumatologist, saw Plaintiff at the request of Dr. D'Auria. (Tr. 289). Dr. Iskander's impression was that Plaintiff's symptoms were consistent with the previous diagnosis of fibromyalgia. (Tr. 290). Dr. Iskander also diagnosed chronic back pain due to degenerative disc disorder, as well as depression, anxiety, and panic attacks. (Tr. 290). Dr. Iskander counseled Plaintiff on the importance of home low back and low-impact aerobic exercises and told Plaintiff to continue taking her prescribed medications. (Tr. 290).

### *Dr. D'Auria's Findings*

Dr. D'Auria treated Plaintiff for fibromyalgia and degenerative disc disease of the lumbar spine from April 2008 to September 2009. (Tr. 279–85, 304–20, 343–44). Dr. D'Auria prescribed Lyrica and Vicoprofen for pain, which Plaintiff reported allowed her to be functional, although they did not completely eliminate her symptoms. (Tr. 281, 304–05).

In April 2009, Dr. D'Auria completed a physical residual functional capacity (RFC) evaluation form. (Tr. 277–78). Dr. D'Auria found Plaintiff could lift up to twenty pounds occasionally and ten pounds frequently, stand or walk for a total of one hour per day and thirty minutes without interruption, and sit for total of one hour per day and twenty minutes without interruption. (Tr. 277). He also indicated Plaintiff could rarely if ever perform postural activities such as climbing, balancing, stooping, crouching, kneeling, or crawling, could rarely if ever push or pull, but could frequently reach, handle, feel, and use fine and gross manipulation. (Tr. 277–78). He indicated Plaintiff needed a sit/stand option. (Tr. 278).

### *Dr. Padamadan's Findings*

In July 2008, Dr. William Padamadan examined Plaintiff and evaluated her physical RFC

3

at the request of the Ohio Disability Determinations Service. (Tr. 223–30). Plaintiff stated she had pain throughout her body, but primarily in her lower back and left shoulder. (Tr. 223). She reported pain intensity of 8/10 with "inappropriate laughing". (Tr. 223). Plaintiff also claimed her left arm had atrophied, but Dr. Padamadan's examination revealed Plaintiff's arm had not atrophied and its measurements were normal. (Tr. 223). Plaintiff also complained of being unable to rotate her left arm beyond 40 degrees. While Plaintiff's range of motion in her left shoulder was limited when directly tested, Plaintiff was not so limited when Dr. Padamadan indirectly tested her range of motion while she was in a different position. (Tr. 223–24). Dr. D'Auria reported Plaintiff walked without any ambulatory aid, showed no clinical signs of distress, was able to get in and out of her chair, and on and off the examination table easily. (Tr. 223–24). Her ability to bend forward was normal, she had no sensory or reflex abnormalities, and was able to walk on her heels and toes, and squat without difficulty. (Tr. 224).

Dr. Padamadan diagnosed Plaintiff with conversion reaction with Waddell's signs[2] of left shoulder and low back pain. (Tr. 225). He indicated Plaintiff's hearing, speech, and sight were within normal limits; her communications skills were normal; she was able to sit, stand, and walk; and her upper extremity functions for reaching, handling, and fine and gross movements were intact. (Tr. 225). Dr. Padamadan concluded that he did "not see any indication for limitation of physical activities." (Tr. 225).

### *Dr. Tinianow's Findings*

In July 2008, Dr. Jessica Tinianow, a state agency physician, reviewed Plaintiff's medical

---

[2] "Waddell's signs" refers to a clinical test for patients with physical pain "that can be used to indicate whether the patient is exaggerating symptoms". *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 420 (6th Cir. 2008).

4

records and assessed her impairments. (Tr. 249). Dr. Tinianow stated Plaintiff alleged a disability due to left should and lower back pain. (Tr. 249). She reviewed Dr. Padamadan's report and findings, and based on those results, concluded Plaintiff did not have a severe medical impairment. In January 2009, Dr. Esberdado Villanueva, another state agency reviewing physician, reviewed Plaintiff's medical records, including new evidence submitted for reconsideration, and affirmed Dr. Tinianow's conclusion. (Tr. 342).

**Administrative Hearing**

At the administrative hearing, Plaintiff testified she stopped working in August 2007 due to complications with her pregnancy. (Tr. 31). After she gave birth in 2008, Plaintiff started having pain in her tail bone, back and legs, and Dr. D'Auria eventually diagnosed fibromyalgia. (Tr. 31). Plaintiff indicated she has pain all over her body, with the most severe pain occurring across the top of her back, the low back, left shoulder, and left leg. (Tr. 39). She also testified she has two to three panic attacks per day "on a good day". (Tr. 41). According to Plaintiff, her medication helps her be functional at times, but it does not allow her to be functional at all times. (Tr. 43).

Plaintiff testified she lives in a ranch-style house with her husband and two children (Tr. 32), and her husband takes care of the household chores (Tr. 33). Plaintiff also testified her mother comes to the house each day to take care of the children. (Tr. 33). Plaintiff spends most of each day in bed or pacing the floor. (Tr. 35).

Karen Krull, a vocational expert, also testified at the hearing. The vocational expert considered jobs in the national economy for an individual with Plaintiff's age, education, and work experience, with the following limitations: sedentary work with no more than occasional postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing; must have

sit/stand option; could not push or pull with the upper extremities; could perform no more than simple, routine, repetitive tasks that are not performed in a fast-paced production environment with only simple work-related decisions; few work place changes; and only occasional interaction with the public. (Tr. 46). The vocational expert testified that although a hypothetical person with these limitations could not perform any of her past relevant work, there were other jobs in the national economy she could perform, including: alarm monitor (81,000 nationally), sedentary packer (60,000 nationally), and sedentary assembler (30,000 nationally). (Tr. 47).

### The ALJ's Decision

The ALJ found Plaintiff suffers from the severe impairments of panic disorder with agoraphobia, depressive disorder, degenerative disc disease of the lumbar spine, and fibromyalgia. (Tr. 17). However, the ALJ determined Plaintiff had the RFC to perform sedentary work with a number of limitations (Tr. 19) and that there were a significant number of jobs in the national economy Plaintiff could perform (Tr. 22). Accordingly, the ALJ found Plaintiff was not disabled (Tr. 22–23).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD OF DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a)(1)(E). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f) & 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff claims the ALJ erred in two ways: first by failing to give the opinion of her treating physician, Dr. D'Auria, appropriate weight; and second by evaluating Plaintiff's credibility under the wrong standard.

**Treating Physician Rule**

Plaintiff first claims the ALJ was required to adopt the RFC assessment completed by Dr. D'Auria, Plaintiff's treating physician. Dr. D'Auria found Plaintiff was significantly physically limited and only had the ability to: lift/carry ten pounds frequently and twenty pounds occasionally; both sit and stand for one hour of an eight-hour workday with an interruption after 30 minutes; rarely to never climb, balance, stoop, crouch, kneel, push, pull, or crawl. (Tr. 277–78). Dr. D'Auria also believed Plaintiff suffers from severe pain and would need an additional break plus a sit/stand option. (Tr. 278).

The treating-physician rule requires an ALJ "to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians . . . ." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, at 406 (6th Cir. 2009). There is no dispute whether Dr. D'Auria is a "treating source" because as a physician who had an ongoing treatment relationship with

8

Plaintiff, he fits the very definition of the term. *See* 20 C.F.R. § 404.1502. Therefore, Dr. D'Auria's opinion must be given controlling weight if it is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in the case record.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). An ALJ may discount a treating physician's opinion, but must give "good reasons" for doing so. 20 C.F.R. § 404.1527(d)(2).

To meet this standard, an ALJ must do three things: (1) state that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with the other record evidence; (2) identify evidence supporting the finding; and (3) explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) – including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician – to determine the weight that should be given the treating source's opinion. *Wilson*, 378 F.3d at 546.

Where an ALJ fails to follow the procedural requirement of identifying the "good reasons" for discounting the opinion of a treating source and for explaining precisely how those reasons affected the weight given, this "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record.'" *Blakley*, 581 F.3d at 407 (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007)). "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543,

9

552 (6th Cir. 2010).

Here, the ALJ summarized the medical evidence and decided to give Dr. D'Auria's opinion "little weight", despite him being a treating physician, for the following reasons:

> the claimant's primary care physician completed a form indicating that the claimant is limited to standing and walking only one hour during an 8-hour work day and only one additional hour of sitting. I have considered this opinion, but have given it little weight as it is not consistent with the record as a whole. I also note that since he completed the form the claimant has repeatedly reported that her condition is improved with medication and that the physician himself has stated the claimant is functional with medication.

(Tr. 21) (internal citations omitted).

Although the ALJ's reasons here for discounting Dr. D'Auria's opinion were brief, they were sufficient. The ALJ acknowledged Dr. D'Auria's opinion; gave reasons for discounting that opinion; and supported that decision with specific reference to record evidence, including that Plaintiff repeatedly reported improving while on medication (279–85, 304–05) and Dr. D'Auria's own notes that while on medication, Plaintiff was "functional". (Tr. 281). The ALJ therefore followed the treating source and good reasons rules, and her decision to discount Dr. D'Auria's opinion is supported by substantial evidence.

**Plaintiff's Credibility**

Plaintiff next claims the ALJ improperly evaluated her credibility by relying too heavily on objective medical evidence to determine the severity of Plaintiff's fibromyalgia. Plaintiff says the nature of fibromyalgia requires less emphasis on objective medical tests and more deference to Plaintiff's own testimony regarding her pain.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers*, 486 F.3d at 244 n.3 (quoting *Stedman's Medical*

*Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005)). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). CT scans, X-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity." *Id.*; *see also Preston*, 854 F.2d at 820. "[P]hysical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion". *Id.* at 818.

However, "[t]he mere diagnosis of fibromyalgia, coupled with allegations of disabling subjective limitations, does not, *ipso facto*, require an ultimate finding of disability." *Id.* As the Sixth Circuit has said, "a diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits . . . . Some people may have a severe case of fibromyalgia as to be totally disabled from working but most do not and the question is whether claimant is one of the minority." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (citing *Rogers*, 486 F.3d 234; *Preston*, 854 F.2d 815).

In determining the severity of a claimant's pain and its effect on her ability to work, an ALJ must still take into consideration factors set out in the regulations, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures used

11

to relieve pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3)(i)–(vii).

Here, the ALJ recognized Plaintiff's fibromyalgia diagnosis, but concluded the pain was not as debilitating as Plaintiff suggested.  As discussed above, the ALJ gave good reasons for rejecting Dr. D'Auria's opinion as to the severity of Plaintiff's physical limitations, including that Plaintiff reported improvement while on medications (Tr. 305) and Dr. D'Auria's own notes that Plaintiff was "functional" while on medication (Tr. 21, 281, 304).

The ALJ also identified other facts, in accordance with § 404.1529(c)(3), that tended to undermine Plaintiff's credibility with respect to her pain. For example, the ALJ noted Dr. Iskander, a rheumatologist to whom Plaintiff was referred by Dr. D'Auria, recommended exercise for her fibromyalgia pain control (Tr. 21, 290), a treatment plan that is inconsistent with Plaintiff's allegations of complete disability.  Also, examining physician Dr. Padamadan indicated he believed Plaintiff may have been exaggerating her back and shoulder pain (Tr. 223–25), noting that while Plaintiff's range of motion of her shoulders "was quite limited on the left side on command, [] spontaneously she had normal movements."  (Tr. 224).

Dr. Padamadan also reported Plaintiff walked with a normal gait and was able to easily rise from a seating position, as well as get on and off the examination table.  (Tr. 224).  When Plaintiff reported the severity of her pain as 8/10 to Dr. Padamadan, she did so with "inappropriate laughing". (Tr. 223).  Dr. Tinianow, a state agency reviewing physician, also indicated that the presence of Waddell's signs suggested Plaintiff may have been exaggerating her symptoms. (Tr. 249).

Although Plaintiff testified her pain was severe, the "ALJ  is not required to accept a

claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Here the ALJ did just that, and it is a determination accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination."). In short, the record evidence supports the ALJ's credibility determination and RFC assessment, and Plaintiff has not demonstrated she is "one of the minority" for whom fibromyalgia is completely disabling. *Vance*, 260 F. App'x 806.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision denying Plaintiff disability benefits is affirmed.

IT IS SO ORDERED.

    s/James R. Knepp II  
United States Magistrate Judge